IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) KENDA FRANKS, AS NEXT OF FRIEND TO RICKY WAYNE FRANKS, DECEASED,  Plaintiff,  v.  (1) CITY OF BARTLESVILLE, OKLAHOMA, (2) BRAXTON BOWERS,  Defendants. | Case No. 25-cv-00153-SH  JURY TRIAL DEMANDED  ATTORNEY LIEN CLAIMED |

## COMPLAINT

**COMES NOW**, Plaintiff Kenda Franks ("Plaintiff" or "Kenda"), as Next of Friend to Ricky Wayne Franks, deceased ("Mr. Franks" or "Ricky") and for her causes of action against the above-named Defendants, alleges and states the following:

### PARTIES, JURISDICTION AND VENUE

1. Kenda Franks is a citizen of the State of Oklahoma. Plaintiff is the mother of and next of friend to Ricky Wayne Franks, deceased.

2. Defendant City of Bartlesville, Oklahoma ("City" or "Defendant City of Bartlesville") is a municipality located in Washington County, Oklahoma. The City provides and employs the Bartlesville Police Department ("BPD").

3. Defendant Braxton Bowers, ("Officer Bowers" or "Bowers"), was, at all pertinent times, an officer in the Bartlesville Police Department ("BPD"), employed by Defendant City of Bartlesville. At all pertinent times, the Officer Bowers was acting within the scope of his employment and under color of State law. Based upon information and belief, Officer Bowers was a resident of Washington County, Oklahoma at the time of the incidents described herein. Officer Bowers committed

1

underlying violations of Mr. Franks' constitutional rights, explained below in more detail. Officer Bowers is being sued in his individual capacity.

4. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

5. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

6. This Court has supplemental jurisdiction over the state law claims asserted herein, pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

- **Facts Specific to Ricky Wayne Franks**

8. Paragraphs 1-7 are incorporated herein by reference.

9. On or about July 5, 2023, 24-year-old Ricky Wayne Franks experienced a severe mental health breakdown. Ricky lived with his mother, Kenda Franks ("Kenda"), and his grandmother Marie Franks ("Marie"), at Marie's home, located at 1500 Madison Blvd., Bartlesville, OK.

10. At around 1:00 a.m. on July 5, Mr. Franks began self-harming in the form of cutting his wrists at Marie's home.

11. Marie informed the Bartlesville Police Department that Ricky was having a mental health break and self-harming.

12. BPD Officers, including Officer Terry Woods, arrived at Marie's home starting at around 1:30 a.m.

13. Officer Woods was informed by Marie that Ricky and Kenda were in the house and that Ricky had a shotgun and was threatening suicide.

14. Officer Woods obtained Kenda's phone number from Marie and called her.

15. Kenda answered Officer Woods' call and told him that; 1) Ricky was having a mental health issue; 2) the cuts on Ricky's wrists were relatively minor and did not require immediate medical attention; 3) Ricky was talking about suicide; and 4) Ricky did not want to come outside.

16. Kenda then put Ricky on the phone to talk to Officer Woods.

17. Officer Woods asked if Ricky would come outside but Ricky said he did not want to. Ricky informed Officer Woods that he would <u>not</u> harm his mother, Kenda, in any way.

18. Ricky then put Kenda back on the phone with Officer Woods. Kenda told Officer Woods that she was safe, and that Ricky would not harm her. Kenda told Officer Woods that Ricky was a good person but he needed mental health help.

19. Officer Woods spoke with Kenda on the phone until approximately 2:19 a.m. trying to get Ricky to come out of the house. During this time, numerous BPD Officers arrived on the scene, including Officer Braxton Bowers.

20. The BPD Officers, most of whom were armed with rifles, surrounded the residence.

21. After Kenda ended the call with Officer Woods at around 2:19 a.m., Officer Woods began asking Marie, who was outside the home, about Ricky's mental health history and conditions.

22. Marie stated that Ricky had mental health conditions and was prescribed medication to treat them. She further stated that Ricky had had mental health episodes in the past but not as severe as the current one. Marie also told Officer Woods that Ricky was not under the influence of any alcohol or drugs.

3

23. Marie further stated that Kenda was usually the one to calm Ricky down, but that it could take some time to get him to calm down.

24. Officer Woods then called Kenda back. Kenda stated that she was fine but that she did not want to leave the house without Ricky, and Ricky did not want to leave.

25. Kenda stated that Ricky was starting to calm down. She put Ricky back on the phone with Officer Woods, who would later note that Ricky did seem much calmer this time.

26. Ricky told Officer Woods that he trusted him but didn't trust the other officers and that he wanted the officers to stop shining their bright flashlights into the home.

27. Ricky also told Officer Woods he didn't want to come out of the house because he was afraid that the other officers would tackle him, arrest him, and/or shoot him.

28. Ricky additionally stated that he was not going to harm his mother, she was by no means his hostage, and that she was free to leave the house if she wanted to.

29. During this call, Officer Woods heard Ricky tell his mother to leave the residence several times because if she went outside and joined Marie and the officers, the officers would consider leaving. Kenda still didn't want to leave the residence and Ricky told Officer Woods he couldn't force her to leave.

30. Officer Woods told Kenda that his supervisor had approved the officers leaving the area if she would exit the residence. Kenda still said she didn't want to leave her son.

31. Kenda then told Officer Woods she was speaking with BPD Sergeant Ben Hollander on another phone, so Officer Woods told her he would hang up and let her speak with Sgt. Hollander.

32. At about 3:15 a.m. Sgt. Hollander began speaking with Kenda on the phone.

33. Kenda said that Ricky had calmed down and reiterated that she was not in any danger. She said she was in her bedroom and Ricky was in the living room.

34. Sgt. Hollander tried to get Kenda to exit the residence, but she said that she did not want to "abandon" Ricky.

35. Sgt. Hollander continued speaking with Kenda for approximately 45 minutes.

36. Sgt. Hollander asked Kenda if he could speak to Ricky at approximately 4:05 a.m. As Kenda told Sgt. Hollander that he could speak to Ricky, Sgt. Hollander heard gunshots.

37. While Sgt. Hollander had been speaking with Kenda on the phone, Defendant Braxton Bowers had been standing outside the front of the residence.

38. Bowers had been outside looking through a window that was above the residence's kitchen sink for approximately 30 minutes.

39. From the outside, it was easy to clearly see inside the kitchen, as an extremely bright interior light illuminated the kitchen. However, there were no exterior lights, so it was difficult, if not impossible, to see outside of the house if one were standing in the kitchen.

40. At approximately 4:05 a.m., Ricky began walking through the kitchen. His head became visible through the window to Officer Bowers.

41. At that time, Ricky was looking in front of him with his head tilted down towards the floor. He was not facing the window, or Officer Bowers, who was standing outside the window. Ricky was not holding a gun or any other weapon and was not a threat to himself, Kenda, the officers, or anyone else.

42. However, as Ricky walked past the kitchen window, Officer Bowers, without warning, fired three shots from his AR-15 rifle, at least two of which struck Ricky in his chest.

43. Ricky collapsed on the floor of the kitchen, bleeding profusely from the shots Officer Bowers fired.

44. Kenda ran over to Ricky and kneeled down over him, crying hysterically.

45.     BPD Officers, including Bowers, then went to residence's door and rammed it open. The officers entered the home and some extracted Kenda while others approached Ricky, who was lying on the kitchen floor in the same spot where Bowers had shot him. Copious amounts of blood covered Ricky and the kitchen floor all around him.

46.     Corporal Brandon Meyer was one of the BPD Officers who entered the residence after Bowers shot Ricky.

47.     Cpl. Meyer noticed the shotgun that Ricky had been holding earlier in the night on the floor of the laundry room, approximately 15-20 feet away from where Ricky was when Bowers shot him.

48.     Ricky was transported to the hospital via EMS, but the EMTs were unable to resuscitate him. He was officially pronounced dead at the hospital at 4:35 a.m.

49.     At the time Bowers shot him, Ricky posed no threat to any BPD officer or any other person. He was not holding a gun, was acting calmly, and had not made any threats to harm anyone.

- **Policies, Practices, and Customs of the Bartlesville Police Department**

50.     Paragraphs 1-49 are incorporated herein by reference.

51.     BPD has a longstanding policy, practice, and/or custom of failing to adequately train and supervise its officers.

52.     Specifically, the City of Bartlesville has, for many years prior to July 2023, failed to adequately train and supervise its officers regarding: 1) de-escalation; 2) use of force; 3) use of deadly force; 4) the use of force continuum; 5) interacting with mentally ill and/or suicidal individuals; 6) interacting with individuals who are or are suspected of being under the influence of alcohol and/or drugs; 7) use of force on individuals who are unarmed and compliant; 8) investigating BPD officers' uses of force; 9) documenting uses of force; 9) disciplining officers who use unreasonable and excessive force; and 10) tactical disengagement or retreat when the situation is not a serious crime or active threat.

53. Additionally, the City/BPD has an established pattern of using unnecessary and excessive force on civilians, especially those who 1) are not suspected of serious crimes; 2) are suffering from known or obvious mental health issues; and/or 3) who pose no threat to the officers or anyone else.

- **Thomas Gay Incident**

54. For example, on June 1, 2019, BPD officers were dispatched to the house of Willis Gay, Jr., who reported that his son, Thomas Gay, was behaving erratically.

55. Willis Gay told the BPD officers that his son Thomas may be under the influence of drugs but he was unarmed and had not threatened to harm himself or anyone else.

56. BPD Officers Jessica Pitts and William Lewis entered the home and encountered Thomas Gay.

57. Without giving further commands, Officer Lewis deployed his Taser on Thomas. Thomas reacted to being tased but retreated down the hallway – away from the officers – to a bedroom.

58. The officers followed Thomas to the bedroom where Officer Lewis tased Thomas again.

59. Thomas, who was still unarmed, reacted as if in pain when he was tased again. After being tased again, Thomas took a step towards Officer Pitts, who then shot the unarmed Thomas once in the thigh and once in the chest. Thomas collapsed to the ground and later died from the gunshot wounds.

60. Thomas' estate subsequently filed a lawsuit, pursuant to 42 U.S.C. § 1983, against Officers Pitts and Lewis, and the City of Bartlesville under a municipal liability theory.

61. On October 16, 2024, the district court denied Pitts', Lewis', and the City of Bartlesville's motions for summary judgment. *See Burke v. City of Bartlesville, et al.,* 2024 WL 4508959 (N.D. Okla. October 16, 2024).

62. In denying the qualified immunity for Officers Pitts and Lewis, the *Burke* Court held that a jury could find "(1) Officer Lewis tased Thomas when a reasonable officer would have known

7

Thomas was unarmed and posed no threat, and (2) Officer Pitts shot Thomas when a reasonable officer would have known Thomas was unarmed and posed no threat." *Burke v. City of Bartlesville*, 2024 WL 4508959, at *26 (N.D.Okla., 2024).

63.     In denying the City of Bartlesville's motion for summary judgment, the *Burke* Court held and reasoned as follows:

> Here, Defendant City had an established practice of ignoring instances where its officers used force. The City was notified and it failed to remedy the situation. At the very least, Brewington's email in August 2018 informing the Chief of Police and City Manager put Defendant City on notice. Plaintiff has sufficiently plead and argued that Defendant City "ignored" these reports and failed to act...These actions constitute deliberate indifference.
>
> * * *
>
> Based on the pleadings filed by the parties relating to Defendants' Motions for Summary Judgment, the Court finds that the undisputed evidence establishes that Defendant City wholly failed to ensure that Defendant Officers were properly trained on: (1) de-escalation, (2) carrying and use of a Taser, and (3) use of deadly force. *See supra* ¶ IV.A. Plus, the agreed-upon evidence makes clear, Defendant City failed to supervise its officers regarding the use of force and failed to properly investigate or review use of force by BPD officers. Clearly, summary judgment is inappropriate in this case.

*Burke v. City of Bartlesville*, 2024 WL 4508959, at *30 (N.D.Okla., 2024).

64.     Brian Brewington, referenced above, served as the BPD training coordinator from 2010-2016. He also served on BPD's "Use of Force Review Board."

65.     According to Brewington, the Review Board initially met once a month to review 4-5 use of force incidents. However, in 2017, the Board suddenly stopped meeting.

66.     In August 2018, Brewington resigned from the Board shortly after being handed a "large amount of use of force files" and being asked to "rubber stamp" his approval as soon as possible. According to Brewington, he was aware of numerous other incidents in which BPD officers used force that were not included in the large stack he was told to approve.

8

67. Brewington emailed the City Manager and then-Chief of Police Rocky Bevard his resignation letter, in which he explained he was resigning due to the Board's poor practices, failure to meet, and failure to investigate BPD officers' uses of force.

68. The City Manager at the time of Brewington's resignation emailed Brewington expressing concern about the lack of investigations.

69. After Brewington resigned from the Board, he never observed the Board meet.

70. At the time of Brewington's resignation from the Board, the chair of the Board was Kevin Ickleberry. Mr. Ickleberry became BPD Chief of Police on June 12, 2023, a position he still holds.

71. During the *Burke* litigation, it was revealed that Officer Lewis had not received any training on de-escalation.

72. Upon information and belief, the serious deficiencies in training and supervision that plagued BPD in the years leading up to 2019 have persisted to this day. Upon information and belief, the City still fails to adequately train its officers regarding 1) de-escalation; 2) use of force; 3) use of deadly force; 4) the use of force continuum; 5) interacting with mentally ill and/or suicidal individuals; 6) interacting with individuals who are or are suspected of being under the influence of alcohol and/or drugs; 7) use of force on individuals who are unarmed and compliant; 8) investigating BPD officers' uses of force; 9) documenting uses of force; 9) disciplining officers who use unreasonable and excessive force; and 10) tactical disengagement or retreat when the situation is not a serious crime or active threat.

73. Upon information and belief, the City still maintains a policy, practice, and/or custom of failing to review BPD officers' uses of force.

74. In addition to the incident involving Ricky Franks, BPD officers recently used unreasonably excessive force on an unarmed and nonthreatening woman during a traffic stop. This incident,

involving a woman named Misty Armitage, was consistent with, and in furtherance of, their unconstitutional pattern and culture of unnecessary violence.

75. On or around April 24, 2024, Misty Armitage was driving through downtown Bartlesville taking her infant granddaughter, who was reportedly throwing up blood and suffering from a bloody nose, to the hospital.

76. BPD Officer Reed Blackard pulled Ms. Armitage over for allegedly speeding and running a stop sign.

77. Ms. Armitage frantically tried to explain to Officer Blackard that her granddaughter, who was secured in a car seat in the backseat of Ms. Armitage's vehicle, was suffering from a medical emergency and had been throwing up blood.

78. Officer Blackard, seemingly indifferent to the medical emergency, violently extracted Ms. Armitage from the vehicle, took her to the ground, and handcuffed her while yelling at her. Officer Blackard only activated his body-worn camera after Ms. Armitage had been placed in handcuffs.

79. Officer Blackard berated Ms. Armitage, called her "entitled", told her to "shut up," told her if she said another word, he'd "take her ass to jail."

80. When another officer on the scene asked if Blackard was going to take Ms. Armitage to jail, Blackard responded, "I haven't decided yet. But if she keeps up that attitude, she's going."

81. Blackard then returned to his vehicle and asked Ms. Armitage what happened to her granddaughter.

82. Ms. Armitage calmly reported that her granddaughter's nose had started to bleed, and then when they were in the car, she threw up and there was blood in the vomit.

83. Blackard left Ms. Armitage handcuffed in his vehicle and returned to the other officers. One of the other officers baselessly speculated whether Ms. Armitage was drunk. Blackard retorted,

"something's wrong with [Ms. Armitage], she's not acting normal. I think she – she's going. She's gonna go to jail."

84.  Chief Ickleberry subsequently gave an interview with News on 6 concerning BPD's treatment of Ms. Armitage.

85.  In the interview, Chief Ickleberry admitted the BPD Officers, including Blackard, should have handled the situation differently. Indeed, Chief Ickleberry said, "I would say we failed in this situation."

86.  The aforementioned incidents are consistent with longstanding BPD practices and/or customs. These practices/customs include an utter failure to train and supervise officers, particularly in the areas of de-escalation, disengagement, and dealing with mentally unstable suspects, a failure to discipline officers for excessive force, and maintaining a culture condoning the use of reckless force while ignoring de-escalation tactics.

## CAUSES OF ACTION

### I.

### VIOLATION OF THE FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

A.  Individual Liability and Underlying Violation(s) of the Constitution (Officer Bowers)

87.  Paragraphs 1-86 are incorporated herein by reference.

88. At the time of the complained of events, Mr. Franks, as a free person, had a clearly established constitutional right under the Fourth Amendment to be secure in his person and free from unreasonable seizure through objectively unreasonable excessive force to injure him and his bodily integrity.

89. In the totality of the circumstances, Mr. Franks was not suspected of a crime, was unarmed, was surrounded by the officers, had no ability to flee, and was in no way posing any immediate threat of serious bodily harm to the safety of BPD officers or others.

90. Mr. Franks was not a threat to any officer, or to any other person at the time Officer Bowers fired his AR-15 at him.

91. Any reasonable police officer would, or should, have known of these rights at the time of the complained of conduct as they were clearly established at that time.

92. Officer Bowers' actions of using deadly force on Mr. Franks, when he was not a danger to anyone, were objectively unreasonable and excessive under the circumstances, and thereby violated the Fourth Amendment rights of Mr. Franks.

93. Officer Bowers' actions were in reckless disregard of Mr. Franks' federally protected rights.

94. Officer Bowers' use of objectively unreasonable, excessive deadly force restrained Mr. Franks of his freedom and caused him multiple serious bodily injuries, including death, as well as mental pain and anguish, and the damages alleged herein.

95. As direct and proximate result of Officer Bowers' conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Mr. Franks' rights secured by the U.S. Constitution, including punitive damages.

96. Plaintiff is entitled to punitive damages against Officer Bowers for his reckless disregard of Mr. Franks' federally protected rights.

B.   Municipal Liability (City of Bartlesville)

97. Paragraphs 1-96 are incorporated herein by reference.

98. At the time of the complained of events, BPD had a long-standing policy or custom of failing to provide adequate training to BPD officers concerning 1) de-escalation; 2) use of force; 3) use of deadly force; 4) the use of force continuum; 5) interacting with mentally ill and/or suicidal individuals; 6) interacting with individuals who are or are suspected of being under the influence of alcohol and/or drugs; 7) use of force on individuals who are unarmed and compliant; 8) investigating BPD officers' uses of force; 9) documenting uses of force; 9) disciplining officers who use unreasonable and excessive force; and 10) tactical disengagement or retreat when the situation is not a serious crime or active threat.

99. There is an affirmative link between the deprivation of Mr. Franks' constitutional rights and BPD policies, practices and/or customs which the City promulgated, created, implemented and/or possessed responsibility for.

100. BPD knew to a moral certainty' that BPD officers would confront a situation like the one involving Mr. Franks and that, without adequate supervision or training, situations like the one involving Mr. Franks present BPD officers with a difficult choice, which training or supervision would make less difficult, and in which the wrong choice by an officer will frequently cause the violation of a constitutional right.

101. Had Officer Bowers been adequately trained on 1) de-escalation; 2) use of force; 3) use of deadly force; 4) the use of force continuum; 5) interacting with mentally ill and/or suicidal individuals; 6) interacting with individuals who are or are suspected of being under the influence of alcohol and/or drugs; 7) use of force on individuals who are unarmed and compliant; 8) investigating BPD officers' uses of force; 9) documenting uses of force; 9) disciplining officers who use unreasonable and excessive force; and/or 10) tactical disengagement or retreat when the situation is

not a serious crime or active threat; he would not have used deadly force on Mr. Franks under the circumstances presented.

102. Prior to the excessive use of force on Plaintiff, there have been other instances of constitutional deprivations within the BPD that the City was aware of, but failed to alleviate, as discussed in ¶¶ 51-86, *supra.*

103. In deliberate indifference to the harm likely to result, the City took either no remedial action, or inadequate remedial action, in response to the prior constitutional violations conducted by its officers.

104. Thus, the City has created and tolerated and maintained long-standing, unconstitutional department-wide customs, law enforcement related policies, procedures and practices, and failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference with respect to uses of excessive force.

105. The deliberately indifferent training and supervision provided by Defendant City resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant City and were also moving forces behind the violation of Mr. Franks' civil rights and the resulting injuries alleged herein.

106. As a direct result of Defendants' unlawful conduct, Mr. Franks has suffered serious actual physical and emotional injuries, including death, and other damages and losses as described herein entitling Plaintiff to compensatory and special damages, in amounts to be determined at trial.

## II.

## NEGLIGENCE
### (Pursuant to the Oklahoma Governmental Tort Claims Act)

107. Paragraphs 1-106 are incorporated herein by reference.

108. Officer Bowers owed Mr. Franks a duty of reasonable care to assure that he would not use objectively unreasonable force on Mr. Franks.

109. As alleged herein, Officer Bowers breached that duty.

110. As a direct and proximate result of Officer Bowers' negligent uses of force, Mr. Franks suffered actual physical injuries, including death, and mental and physical pain and suffering, entitling Plaintiff to recover compensatory and special damages.

111. At all pertinent times, Bowers was acting within the scope of his employment and, thus, BPD/the City of Bartlesville is vicariously liable for his negligence.

112. Plaintiff timely submitted a Tort Claim to the City of Bartlesville putting them on notice of Plaintiff's claim.

### III.

### Violation of Article II §§ 7 & 30 of the Constitution of the State of Oklahoma
### Excessive Use of Force

113. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 112, as though fully set forth herein.

114. At the time of the complained of events, Mr. Franks, as a free person, had a clearly established constitutional right under the Oklahoma Constitution, Article II § 30, to be secure in his person and free from unreasonable seizure through objectively unreasonable excessive force to injure him and his bodily integrity.

115. As set forth herein, Officer Bowers's use of deadly force was an objectively unreasonable seizure of Mr. Franks' person.

116. Officer Bowers' use of objectively unreasonable, excessive deadly force restrained Mr. Franks of his freedom and caused him multiple serious bodily injuries, including death, as well as mental pain and anguish, and the damages alleged herein. At all pertinent times, Bowers was acting

within the scope of his employment and, thus, BPD/the City of Bartlesville is vicariously liable for his conduct.

117.   Plaintiff timely submitted a Tort Claim to the City of Bartlesville putting them on notice of Plaintiff's claim.

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages and punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F
danielsmolen@ssrok.com
bobblakemore@ssrok.com
bryonhelm@ssrok.com
***Attorneys for Plaintiff***